FILED & JUDGMENT ENTERED
Steven T. Salata

Sep 11 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy Case No. 11-30812 |
| JEFFREY C. ROSS, SR. | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| DAY CARE-SAM FURR, LLC and CAROL MCKINNELL, | ) | |
| | ) | Adversary Proceeding No. 11-03147 |
| Plaintiffs, | ) | |
| v. | ) | **MEMORANDUM OF DECISION** |
| JEFFREY C. ROSS, SR. | ) | |
| | ) | |
| Defendant. | ) | |

In this action Plaintiffs Day Care-Sam Furr, LLC ("Day Care") and Carol McKinnell

("McKinnell") (collectively "Plaintiffs") seek to establish a debt owed them by Defendant/Debtor

Jeffrey C. Ross, Sr. ("Ross") and further, to obtain a declaration that the obligation is non-

dischargeable in bankruptcy under Section 523(a)(2) (false pretenses, false representations and

fraud), Section 523(a)(4) (fiduciary defalcation/fraud) and Section 523(a)(6) (willful and malicious

injury). A trial was held on June 4, 2012.  John R. Buric and John R. Brickley represented the

Plaintiffs; Dennis O'Dea appeared on behalf of Ross.

**Held:** As described herein, Ross used his personal relationship with McKinnell to induce

her to fund Day Care in order that it could acquire and hold a property that he wished to ultimately

purchase under a Section 1031 "like kind" exchange with another of his properties (Community

House). Thereafter, he encouraged McKinnell to have Day Care obtain a line of credit on the

representation that this lending facility would be used to improve Day Care's property. However,

without McKinnell's knowledge or consent, Ross immediately drew down on Day Care's line of

credit and used $220,000 of the proceeds to pay a personal debt.  He successfully concealed his

misuse of the loan proceeds from Plaintiffs for the ensuing two years.

Ross not only breached his agreements with McKinnell and/or Day Care, his misuse of the

proceeds from the letter of credit conduct constitutes willful conversion and fraud under North

Carolina law. Thus, Plaintiffs are entitled to recover their actual damages, punitive damages, costs,

and interest from Ross. Further, these obligations are non-dischargeable in bankruptcy under

Sections 523(a)(2), (a)(4) and (a)(6).


## I.  FACTUAL AND PROCEDURAL BACKGROUND

In early 2006, Ross was in negotiations to purchase a 19-acre tract of land located in

Huntersville, NC.  (the "Sam Furr property").  Ross hoped to construct a "build to suit" day care

facility on a portion of that property for lease to Nobel Learning Communities, Inc. ("Nobel").[1]  At

the time, Ross owned another parcel of real property located on Community House Road, in

Charlotte, NC (the "Community House property"). Originally, Ross tried to interest Nobel in the

---

[1] From Ross' written correspondence, it appears that by Fall 2006, his intentions had changed and he meant to sell the
property to Nobel on a "ready to construct basis."

Community House property, but Nobel found the tract too small for its purposes. Ross then located the Sam Furr property for Nobel and put the Community House property up for sale.

By April 2006, Ross had a contract on the Community House property and had accepted a substantial good faith deposit from Parks Hunter ("Hunter"), the prospective purchaser. However, Hunter was not ready to close. This delay created problems for Ross who needed to purchase the Sam Furr property for his prospective deal with Nobel. Ross could not afford to buy the Sam Furr property until he sold the Community House property.

After a third party declined to lend Ross the money to acquire the Sam Furr property, he attempted to borrow the money from McKinnell, his long time girlfriend. If McKinnell would advance the $475,000 purchase price, upon completion of the day care project, Ross promised to return McKinnell's advance and pay her a fixed $125,000 return.

McKinnell was a divorced homemaker with teenage children. Her primary asset was her home, which she owned free and clear of liens. McKinnell was interested in Ross's proposal, thinking this would provide her a return on her equity and thereby afford her greater financial independence from her ex-husband. However, McKinnell had no experience in business, let alone real estate development. Thus, she was reluctant to incur debt on her home in order to loan Ross the Sam Furr property purchase money.

Hoping to persuade McKinnell, on or about April 13, 2006, Ross took her to meet with his attorney, Joseph Tissue ("Tissue"). Tissue had been working with Ross on both the Community House property and the Sam Furr property/Nobel deals. At that meeting, Ross and Tissue made a second proposal to McKinnell whereby the parties would employ a limited liability company to acquire and develop the Sam Furr property. As proposed, Ross would own 90% of the LLC and serve as its manager. McKinnell would own 10%, despite the fact that she would be contributing all

of the capital by which the LLC would purchase the Sam Furr property.  Ross once again proposed to pay McKinnell a flat $125,000 return for use of her money, with the further offer that the LLC would cover debt service on her home loan.  Anticipating McKinnell's agreement, Tissue formed Day Care in April 2006.

However, obtaining McKinnell's agreement proved not to be so simple.  In addition to her unfamiliarity with real estate development, McKinnell did not want to contribute capital to an LLC that she did not control—particularly since she was going to have to mortgage her house to obtain her investment money.  She did not accede to Ross's second proposal.

Discussions between Ross and McKinnell concerning the day care development continued over the summer. Agreement was reached only when Ross offered to make McKinnell the sole member, manager and registered agent of Day Care in exchange for her capital contribution to the LLC and the remainder of their agreement. This satisfied McKinnell's control issue and she agreed to fund Community House and thereby the Sam Furr property purchase.

By this point, Ross and Tissue had added an additional wrinkle to the deal. They hoped to shield Ross's prospective gain on the Community House property sale from taxation through use of an IRC Section 1031 "like kind" exchange. Ross originally sought a loan from McKinnell so he, Ross, could buy the Sam Furr property.  Now it was necessary that a third party acquire the tract and hold it until Ross could close the Community House property sale.  Ross would then be in a position to "swap" his Community House property proceeds for the Sam Furr property.[2]  Because McKinnell owned Day Care, Tissue deemed it to be a suitable "accommodation party" for tax purposes. Having a LLC hold title to the Sam Furr property would shield McKinnell from personal liability for the LLC's debts.

---

[2] This is an oversimplification. Tissue's idea was that in lieu of buying Sam Furr from Day Care, under the tax laws, Ross could acquire ownership of Day Care from McKinnell and still shelter the gain.

The arrangement was implemented on August 30, 2006 at Tissue's office.   Day Care's Articles were amended to make McKinnell its sole member.   Tissue closed a home equity line for McKinnell, and she borrowed $575,000 against her home to fund her capital contribution to Day Care.

Ross and McKinnell then executed two agreements prepared by Tissue to memorialize their arrangement.   First, the parties signed a Real Estate Acquisition and Qualified Exchange Accomodation (sic) Agreement (the "Accommodation Agreement").   The Accommodation Agreement provided that McKinnell[3] would purchase and hold the Sam Furr property until Ross sold the Community House property.   At that time, Ross would purchase the Sam Furr property from McKinnell as a Section 1031 replacement property. Ross testified at his deposition that he intended to be bound by this document.

Second, Ross and Day Care (acting through McKinnell), executed a Project Management Agreement for Qualified Exchange Accomodation (sic) Arrangement (the "Management Agreement").   The Management Agreement governed the relationship between Ross and Day Care with respect to the Sam Furr property. It gave Ross certain rights, such as managing improvements to the property and hiring the professionals to do the work. Ross testified at his deposition that he understood the Managing Agreement, and intended to be bound by it.

The two Agreements were not specific as to the compensation and division of profits. Notably, the Management Agreement did <u>not</u> give Ross the right to any compensation for his efforts. Ross and McKinnell never discussed Day Care paying Ross for any work that he may perform on its behalf.

---

[3] The Accommodation Agreement deems McKinnell the accommodation party, even though it was intended by both Ross and McKinnell that Day Care would take title to the Sam Furr property. Tissue's documents suggest that the dichotomy existed because, as McKinnell's wholly owned LLC, Day Care would be disregarded for Section 1031 purposes.

Further, and unlike Ross's prior offers to McKinnell to pay her a fixed $125,000 return for the use of her money, the Acquisition Agreement also did not provide McKinnell a profit when the Qualified Exchange was made. Rather, she would receive only the return of her investment, costs and interest paid to her lender. *See* Accommodation Agreement 2.3.1. However, if Ross failed to complete the swap within 180 days of the Sam Furr property purchase (not the swap property), Day Care (McKinnell) was entitled to retain the Sam Furr property and claim against Ross for any resulting loss.

Ross says there was a further, unwritten agreement that when the Sam Furr property was leased or sold, McKinnell was to be reimbursed her costs and receive a $125,000 profit. Anticipating that he and McKinnell would be married by this point, Ross says the profits over and beyond this amount were to be shared. McKinnell denies his assertion, and it appears this was an understanding in Ross's mind only and an amorphous one at that.[4] The Project Management Agreement contains a merger clause (Par. 12) while the Acquisition Agreement specifically prohibits verbal, unsigned amendments. *See* Par. M. Ross says he realized at some point that the written documents did not include their (his) oral understanding about the division of profits, but he never asked Tissue to correct that oversight, if that is what it was. As such, the two written documents comprise the parties' entire agreement.

Under those written agreements, Ross stood to profit (vis-à-vis McKinnell), if he completed the swap. He would acquire the Sam Furr property by virtue of what is essentially an interest free loan from McKinnell. If Ross failed to timely reacquire the Sam Furr property, it was unclear who stood to benefit. Contractually, McKinnell could retain the Sam Furr property and if it proved to be

---

[4] Ross also testified that he was owed at least $220,000 by Day Care for his development services because the agreements do not pay him for his work. Apparently Ross intended to collect some undefined amount for his work, before any split of profits.

worth less than her investment, she could recover the difference from Ross.  McKinnell would profit only if (1) Ross failed to reacquire the Sam Furr property and (2) it was worth more at the time than the sums McKinnell had loaned to the LLC, plus interest and costs.

With the Agreements inked, Day Care then purchased the Sam Furr property for the sum of $480,000, using McKinnell's investment.[5]

Meanwhile, Ross was still negotiating with Nobel for a day care facility on the front (Highway 73) four or five acres of the Sam Furr property.  The facility was anticipated to cost about $2.5 million. Ross thought that once he obtained Nobel's agreement to lease the facility, he (for Day Care) would be able to obtain construction financing. However, by mid-November, 2006, the deal had morphed into a prospective purchase by Nobel of a "construction ready" parcel from Day Care.

By Fall 2006, the first segment of Ross's Section 1031 exchange--the Community House property sale--was almost ready to close. However, a major problem arose when Tissue learned that Ross had previously received a large ($460,000) earnest money deposit from the buyer. Under applicable tax law, and as the seller, Ross could not have constructive receipt of the buyer's money. Accordingly, Tissue told Ross to return the deposit to the buyer, so that this portion of the purchase price could be "paid" at closing to the qualified intermediary.

Ross did not have the money.  Rather than escrowing the buyer's deposit, Ross had put it in his bank account. He had since spent the deposit on personal living expenses and to pay debts.  He could come up with $240,000 to return to Hunter, but he was short another $220,000. Ross told Tissue of his problem but did not inform McKinnell.

Ross solved his liquidity problem by conning McKinnell and then misappropriating monies from Day Care.  Ross first convinced McKinnell to have Day Care open a checking account and to

---

[5] $500,425 inclusive of settlement charges.

take out a $300,000 line of credit at his bank, Southern Community Bank and Trust ("the Bank").
Ross told McKinnell the line of credit was needed so that he could pay vendors for improvements to
the Sam Furr property.  Ross even arranged the loan for Day Care, filing a loan application on its
behalf on November 20, 2006 with his loan officer.

The line of credit was secured by a deed of trust on the back part of the Sam Furr property.
Ross guaranteed the debt.  Both McKinnell and Ross were given signature authority on Day Care's
bank account and borrowing authority on its line of credit.  At Ross's request, Day Care's bank
statements were to be mailed to his personal residence.

While Ross told McKinnell the line of credit was to fund development activities on the Sam
Furr property, he had something else in mind.  In emails supporting the loan application, Ross
separately told the Bank that the line of credit was needed to effectuate an "exchange." He intended
to immediately draw on the line, telling the Bank that he would need the loan proceeds wired to
Tissue a few days prior to the Community House property closing.  Thus, from the outset, Ross
intended to have Day Care take out a line of credit so that he could use it to repay Hunter. Tissue
was aware of Ross's intentions regarding the use of the loan proceeds.[6]  McKinnell and Day Care
were not.

On December 5, 2006, Day Care closed its line of credit loan with the Bank. Tissue handled
the closing. From the $300,000 of gross borrowing availability under the line, at the closing
$233,895 was disbursed as a "Seller's (Day Care's) draw." At Ross's request, these monies were
wired to Tissue's trust account and from there $220,000 was forwarded by Tissue to Hunter as a
partial return of his earnest deposit.[7]

---

[6] This is not to suggest that Tissue was complicit in the fraud.  Tissue's contact was Ross who he believed spoke for
McKinnell and Day Care.
[7] The remainder of the draw funded property taxes on the Sam Furr property.

One day later, on December 6, 2006, Ross sold the Community House property to Hunter, who partially paid for it with Day Care's money.  A qualified intermediary took possession of the $453,413.25 net sales proceeds, awaiting Ross's completion of the Section 1031 exchange.

 McKinnell was present at the closing on Day Care's line of credit and she was aware that Ross was about to sell his Community House property.  She was not privy to the fact that Ross was short $220,000 and intended to fund the return monies through a draw on the Day Care line of credit.

Although Ross says otherwise, the greater weight of the evidence suggests McKinnell was not aware of his plans. McKinnell's testimony as to these matters was more credible than the testimony of Ross. Her memory of these events was clearer. Further, her actions are consistent with a lack of knowledge about Ross's intentions. Having balked at the idea of loaning Ross money for the Sam Furr property acquisition, it is unimaginable that four months later she would give Ross $220,000 to repay a personal debt without so much as a note, security or even a question about the transaction.

At his deposition Ross predicted that Tissue would corroborate McKinnell's knowledge about the $220,000 draw. He did not.  Rather, Tissue testified that all of his discussions regarding these transactions were with Ross, his long-time client.  Tissue recalls no discussion in which McKinnell was told that Ross was going to use Day Care's line of credit to repay his debt to Hunter. According to Tissue, McKinnell was not told, because there was no reason to do so.

Tissue's remark is an apt description of the relationship between Ross and McKinnell, his girlfriend/financier.  Ross, the developer, was the active party in these transactions. He made the development and marketing plans; handled negotiations with third parties; and communicated with Tissue.  McKinnell was not copied with the many emails between Ross and Tissue which relate to these deals.  None of them reflect any knowledge on her part about the $220,000 draw. While legally

the owner/manager of Day Care, as a practical matter McKinnell was only a passive funding source for Ross's venture.

In sum, Ross caused Day Care to pay $220,000 of the purchase price for the Community House property, without McKinnell's knowledge and in contravention of his limited authority under the Management Agreement. He personally received those sale proceeds (via the qualified intermediary). Meanwhile, Day Care incurred a secured debt to pay Ross's personal obligation, without McKinnell's knowledge. This subterfuge was possible because (1) McKinnell trusted Ross and (2) the Day Care bank statements were mailed to Ross's home address. McKinnell would not learn of the $220,000 draw for two more years.

With the Community House property sold, Ross was now financially able to repurchase the Sam Furr property from Day Care and to complete the contemplated Section 1031 exchange. Even so, he failed to complete the swap. The exchange termination deadline found in the Acquisition Agreement ran on February 26, 2007.[8] The tax deadline to complete the swap ran on or about June 4, 2007 (180 days after his sale of Community House). Both deadlines passed without Ross even making an offer to Day Care to complete the transaction. Ross testified during his deposition that he does not know why he did not purchase the Sam Furr property from Day Care. (Ross I Tr. 96-97). However, the circumstantial evidence provides an explanation. As of December 6, 2006, the date Community House closed, Ross still expected to close his deal with Nobel within the exchange period. A draft letter of intent was circulating between Ross and Nobel on December 4, 2006 by which Nobel would purchase the front part of the Sam Furr property for $885,000.

---

[8] From a tax perspective, Ross had until June 4, 2007 (180 days after his sale of the Community House property) to complete the Section 1031 exchange. However, under the Acquisition Agreement he had only 180 days from Day Care's August 30, 2006 acquisition of the Sam Furr property to complete the swap, meaning February 26, 2007. *See* Acquisition Agreement, par. 7.

Ten days later, on December 14, 2006, Ross was informed that Nobel was no longer interested in the property. This left Ross without an end purchaser for the Sam Furr property and no way to complete his tax-free exchange. This unexpected development quelched Ross's interest in reacquiring the Sam Furr property from Day Care.

Additionally, a change in Ross and McKinnell's personal relationship may have also adversely affected Ross's interest in the Sam Furr property.  During a ski trip over the Christmas holidays, Ross and McKinnell discussed their future. Ross was interested in marriage; apparently, McKinnell was not.  A month later, in January 2007, the couple stopped dating. Ross married someone else sometime before Summer 2007.

In spite of these changes, Ross and McKinnell tried to find other buyers for the Sam Furr property. Because Ross's proposed day care project would only require four or five acres of land, early on Ross and McKinnell decided to divide the Sam Furr property into two parcels.  They intended to separately sell or develop the back fifteen acres. In late 2007, McKinnell located a prospective purchaser, Tim Badour, for the back parcel. On January 28, 2008, Day Care sold that parcel to Badour.  Ross handled the sale for Day Care and Tissue served as its counsel in regard to the closing.  McKinnell attended that closing for the purpose of signing the deed and other documents on behalf of Day Care. Otherwise, she had no active role.

The Badour sale fetched $575,000.  However, Day Care only received approximately $277,000 net proceeds from the closing.  The remaining monies went to closing costs and to pay off Day Care's line of credit ($285,127.57) with the Bank.  McKinnell was aware that the Bank was being paid out of that closing. Assuming the Bank's balance to represent Ross's expenditures on the Sam Furr property, she did not question the payment.  She trusted Ross and relied upon him to handle the development of the Sam Furr property and these property transactions.

After the June 2007 exchange deadline ran, the qualified intermediary returned the Community House property sales proceeds ($456,172) to Ross. Exactly what he did with those monies is not known.  Around the same time, Ross and his new wife acquired a $2.0 million home on Green Dolphin Lane, in Cornelius, NC.[9]  Ross denies that he used any of the Community House property proceeds on that residence. It is certainly possible that he did, but McKinnell failed to provide any evidence at trial to support such a finding.

By September 2008, McKinnell had come to believe that Day Care had received less than what it was due in the Badour closing.  She first sought answers about the line of credit payoff balance from the Bank. She then contacted Tissue's office to ask about the $220,000 wire made to his office from the loan closing.  Now, almost two years after the fact, McKinnell first learned that Ross had drawn down $220,000 on Day Care's line of credit and used it to pay his debt.

In addition to the $220,000 drawdown, Ross had taken monthly draws on Day Care's line of credit, paradoxically, to pay the monthly payments ($1,700-1,900) on the credit line. (Ross I Tr. p.144).  McKinnell asserted that she was not initially aware of this practice, and only discovered it when she began to investigate the disbursements from the line of credit closing. As to the latter assertion, she appears to be mistaken. In an email to Ross dated April 15, 2008, McKinnell indicates that by March 2008, she was aware of these draws.

A relatively small amount of the monies borrowed on the line of credit (less than $27,000) were actually used as intended—to develop and improve Sam Furr property. By the time the credit line was paid off at the January 2008 closing, the loan balance had grown to over $285,000.

Upon discovery, McKinnell made repeated demands on Ross to return that money to Day Care.  Ross admitted to McKinnell that he owed her, or more precisely, owed Day Care the money

---

[9] Per Schedule A of Ross' Bankruptcy Petition.

and repeatedly promised to repay it. (Ross I Tr. p.l83); (Ross III Tr. p.168) (agreeing that the $220,000 was taken from Day Care's credit line and needs to be paid back). To date he has not done so.

On April 1, 2010, Plaintiffs filed a civil action against Ross and his current wife in the Superior Court Division of the General Courts of Justice in Mecklenburg County, North Carolina, docket number 10-CVS-7589.  That case proceeded to trial on March 29, 2011. Shortly before lunch, the case was called and the jury selection process began.  However, during the lunch break, Ross filed this Chapter 7 case.  On July 5, 2011, Plaintiffs filed the instant Adversary Proceeding in this bankruptcy court.

## II. DISCUSSION

### I.  Plaintiffs Day Care and McKinnell are Entitled to Relief on Each of Their Substantive Claims.

#### a.  The Plaintiffs and the Defendant's motion to dismiss.

At trial, Ross asked that McKinnell's claims against him be dismissed given that the $220,000 draw was against Day Care's line of credit and therefore was its property, not McKinnell's. The motion was denied at trial, subject to being reconsidered when this decision was made. This Court agrees with Ross that the monies at issue, the $220,000 draw, were Day Care's property.  However, Day Care is and always has been a single asset company whose only significant activity has been to acquire and hold title to the Sam Furr property.  McKinnell is for all intents and purposes, Day Care.

While technically Ross misappropriated Day Care's money, that money existed only because McKinnell funded Day Care (at Ross's request) so that it could acquire the Sam Furr property. This in turn enabled Ross to obtain a line of credit for Day Care and to divert the $220,000.  Further, Ross had his discussions (or in some cases failed to have discussions) with McKinnell, Day Care's only member. While technically it was Day Care's money that he diverted, it was McKinnell who he was hoodwinking.

Given these circumstances, we need not split hairs between what Ross did vis-à-vis Day Care and what he did with McKinnell. As between Day Care and McKinnell, any recovery would belong to Day Care. However, for present purposes we may treat their claims as unitary.

### b. Conversion

Under North Carolina law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Peed v. Burleson's, Inc., 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (internal quotation marks omitted); *see also* Stratton v. Royal Bank of Canada, 712 S.E.2d 221, 227 (N.C. Ct. App. 2011). Even where the defendant has lawfully obtained possession or control over the goods or chattel, that possession and control become unauthorized and tortious when the plaintiff demands return of them and defendant refuses. *See* Stratton, 712 S.E.2d at 227.

Here, the evidence easily satisfies the essential elements of a willful conversion. As described more fully above, Ross took funds from Day Care's line of credit without permission, for his own purposes and benefit. By using the LLC's funds to satisfy a personal obligation, Ross effectively prevented Day Care/McKinnell from using their own money.

Ross had limited authority to use Day Care's line of credit to improve the Sam Furr property. He did not have the right to use it for his own benefit. To the extent he was allowed to make some draws on the credit line, he undoubtedly exceeded the scope of Plaintiffs' consent by using the money for himself. And, by refusing to refund the money, even after acknowledging the debt, Ross has further interfered with Day Care's right to its funds. In his deposition, Ross acknowledged that he took money that did not belong to him:

> Q. So, at the time the Day Care-Sam-Furr purchased the only property that it's ever purchased, Carol was the only member and the only manager of that entity, correct?

A.  Yes.

Q.   And the funds that were used to purchase that property were her funds, correct?
A.  They were funds that were from the bank secured by her house.

Q.   They were funds that she obtained in a loan; the loan was secured by the house, correct?
A.  Yes.

Q.  So they were Carol's dollars, correct?
A.  Yes.

Q.  Not Jeff Ross's dollars?
A.  That's right.

Q.  And then an equity line is taken out and $220,000 of that is used to pay Jeff Ross's obligations to Parks Hunter, correct?
A.  That's correct.

(Ross III Tr. p.193).

Therefore, Plaintiffs are entitled to a judgment in their favor for their conversion claim.

### c. Fraud

To prove a claim for fraud, a plaintiff must show the following essential elements: a "(1) [f]alse representation or concealment of a past or existing material fact, (2) reasonably calculated to deceive,  (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured  party."  Whisnant  v. Carolina  Farm Credit, 204 N.C. App. 84, 94, 693 S.E.2d 149, 156-57 (2010) review denied, 705 S.E.2d 745 (N.C. 2011).

For a statement to be actionable, the defendant must have known that the representation was false when making it, or done so with reckless disregard for its truth as a positive assertion. *See* Ausley v. Bishop, 133 N.C. App. 210, 217, 515 S.E.2d 72, 78 (1999).  The representation must also be material, in that it would have influenced the recipient's decision to act. *See* Latta v. Rainey, 202 N.C. App. 587, 599, 689 S.E.2d 898, 909 (2010).  While a misrepresentation generally must be

specific, the level of required specificity "depends upon the tendency of the statements to deceive under the circumstances." Ragsdale v. Kennedy, 286 N.C. 130, 139, 209 S.E.2d 494, 500 (1974). Finally, the scienter requirement can be shown by circumstantial evidence or by showing a motive of the individual making the statements. *See* Latta, 202 N.C. App. at 600, 689 S.E.2d at 909.

Here, Ross's actions constitute actual fraud. First, he intentionally misrepresented to McKinnell that the line of credit was necessary to improve Day Care's property, and that it would be used for that purpose. He then stole funds for himself by surreptitiously drawing on the line of credit.

Ross concealed his actions for approximately two years, aided in part by (1) convincing McKinnell to permit him to manage Day Care's finances, (2) excluding McKinnell from his communications with Tissue and (3) by having Day Care's loan and checking account statements sent to his home. Ross intended to conceal his actions and successfully did so.

McKinnell reasonably relied on Ross's misrepresentations. While a party at arms length with Ross might have noticed and investigated the HUD-1 disbursements relating to the $220,000 draw that Ross made for his own benefit, given the intimate personal relationship between McKinnell and Ross, the great disparity in their knowledge of real estate transactions, and the almost total control Ross exercised in these transactions, her reliance on Ross's misrepresentations was reasonable.

As such, Plaintiffs are entitled to a judgment against Ross on their claim for fraud.

### d. *Constructive Fraud*

In order to make out a claim for constructive fraud, Plaintiffs must show (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiffs were, as a result, injured. *See* Sterner v. Penn, 159 N.C.App. 626, 631, 583 S.E.2d 670, 674 (2003). In order to make out their claim, Plaintiffs do not need to

show that Ross intended to deceive them – only that he intended to benefit himself.  *See* White v.
Consol. Planning. Inc., 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004).

Similarly to Plaintiffs' claim for actual fraud, Plaintiffs are also entitled to judgment on their
claim for constructive fraud.  Ross and McKinnell were in a dating relationship, and Ross exerted
influence on McKinnell throughout all the events described above.  He convinced McKinnell to
obtain a substantial loan by mortgaging her home.  He clearly took advantage of their relationship
and trust by taking money from Day Care and using it to satisfy his personal debts.

If Ross was going to use Day Care's line of credit, he had a duty to use the proceeds only to
improve the Sam Furr property or to provide some other benefit to Plaintiffs.  As a result of his
conduct, Ross caused damage to Plaintiffs, for which they are entitled to a recovery.

### e. Constructive Trust

In North Carolina, where actual or constructive fraud has been committed, courts may impose
a constructive trust over the property that was unjustly obtained through a breach of duty. *See* Roper
v. Edwards, 323 N.C. 461, 464, 373 S.E.2d 423, 425 (1988); *see also* Graham v. Martin, 149 N.C.
App. 831, 836, 561 S.E.2d 583, 586 (2002).  "A constructive trust is imposed 'to prevent the unjust
enrichment of the holder of title to, or of an interest in, property which such holder acquired through
fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the
claim of the beneficiary of the constructive trust.'" Roper, 323 N.C. at 465, 373 S.E.2d at 425
(quoting Wilson v. Development Co., 276 N.C. 198, 211, 171 S.E.2d 873, 882 (1970) (emphasis
omitted)).

As described above, Ross has committed both actual and constructive fraud against Plaintiffs.
By misappropriating and retaining Plaintiffs' funds, he has unjustly enriched himself to Plaintiffs'
detriment.   Accordingly, this Court would be inclined to impose a constructive trust in Plaintiffs'
favor on the property that Ross acquired using Plaintiffs' money, but for two circumstances.

First, Plaintiffs have failed to trace the proceeds of the letter of credit draw into any specific property that Ross owned as of the date of bankruptcy.  Obviously, Ross sent the $220,000 to Hunter in the Community House property closing. The sale closed and Ross got that money in June 2007 after the Section 1031 exchange time lapsed, and when the qualified intermediary sent the Community House property sales proceeds to him.

However, there the trail goes cold. Plaintiffs reasonably suspect that Ross used the Community House property sale proceeds to purchase his Green Dolphin home residence. However, apart from the timing of Ross's acquisition of the closing proceeds and purchase of the home, there is no evidence in the record to this effect. Given the casual way Ross handled his money and that of others, anything is possible.  Thus, the Plaintiffs' constructive trust claim fails for lack of tracing to an identifiable property.

Moreover, at the date this opinion was written, the Green Dolphin property was in foreclosure. For a constructive trust to advantage them, Plaintiffs would have to demonstrate some legal basis to "prime" the mortgage lender as to that property.  The lender is not a part of this lawsuit, and Plaintiffs have suggested no basis by which a constructive trust in their favor would put their equitable claims ahead of the lender's recorded mortgage.

Finally, Ross is in a Chapter 7 bankruptcy case.  He owes a considerable number of creditors. There are no known assets in the bankruptcy estate of any appreciable value, but apart from exempt property, whatever assets Ross possesses belong to the estate.  Equitable liens and constructive trusts are disfavored in bankruptcy as they upset the statutory priority scheme for paying creditors. *See* In re 222 South Caldwell Street, Ltd. Partnership, 409 B.R. 770, 795 (Bankr. W.D.N.C. 2009); *see also* Kunkel v. Ries (In re Morken), 199 B.R. 940, 965 (Bankr. D. Minn. 1996) (citing U.S. v. Noland, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996)).  Effectively, the beneficiary of an equitable lien or constructive trust receives full payment on his claims; other creditors go hungry.  When we

add to this inequity the fact that a bankruptcy trustee enjoys bona fide purchaser for value status as to real property owned by the debtor and judgment execution creditor lien status as to personal property (*see* 11 U.S.C. § 544(a)(1) and (a)(3)), the remedy of a constructive trust is generally untenable in bankruptcy. Finally, Plaintiffs have not joined the bankruptcy trustee to this dischargeability action. Therefore, they cannot establish a constructive trust on any estate property.

Therefore, the Plaintiffs' request for a constructive trust is **DENIED.**

### f. Unfair and Deceptive Trade Practices

"To set out a claim for unfair and deceptive trade practices, a plaintiff must allege that (1) defendant has committed unfair or deceptive acts or practices; (2) defendant's conduct was in commerce or affected commerce; and (3) defendant's conduct caused injury to plaintiff." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000). "Whether an act is an unfair or deceptive practice is a question of law for the court." Songwooyarn Trading Co., Ltd. v. Sox Eleven, Inc., 714 S.E.2d 162, 167 (N.C. Ct. App. 2011).

Generally, "an unfair act or practice is one in which a party engages in conduct which amounts to an inequitable assertion of its power or position. Furthermore, an act is unfair or deceptive under N.C. Gen. Stat. § 75-1.1 if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 189 N.C. App. 601, 607, 659 S.E.2d 442, 448 (2008). The statute does not specify what constitutes an unfair or deceptive act, and the court should consider the circumstances around the transaction and the impact on the marketplace. *See* Noble v. Hooters of Greenville (NC), LLC, 199 N.C. App. 163, 166-67, 681 S.E.2d 448, 452 (2009). Relevantly, North Carolina courts have held that a plaintiff who proves fraud may thereby establish that an unfair or deceptive trade practice occurred. *See*, e.g., Davis v. Sellers, 115 N.C. App. 1, 9, 443 S.E.2d 879, 884, disc. review denied, 339 N.C. 610, 454 S.E.2d 248 (1995).

Obviously, Ross's fraud upon Day Care/McKinnell qualifies as a deceptive act under N.C. Gen. Stat. § 75-1.1.   It is also clear that the third requirement, that the defendant's conduct caused injury to the Plaintiffs, has been met.   Due to Ross's conduct, Day Care/McKinnell suffered the loss of the $220,000 plus accrued interest on that sum.

The difficult question is whether Ross's misconduct was "in commerce or affected commerce" within the meaning of the statute.   Here, while the misappropriation was in a financial transaction between Ross and the Plaintiffs, it was one based upon a personal relationship between Ross and his girlfriend, McKinnell. Alternatively, it can also be considered an internal offense between Ross as Day Care's agent and the LLC.

The North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75–1.1 ("Act"), was intended to regulate a business's regular interactions with other market participants. *See* HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991).   The Act defines "commerce" as "business activities." *Id.* (quoting N.C. Gen. Stat. § 75–1.1(b)).   The Supreme Court has explained that "'[b]usiness activities' ... connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *Id.*

In Bhatti v. Buckland, 328 N.C. 240, 245–46, 400 S.E.2d 440, 443–44 (1991), the Supreme Court held that N.C. Gen. Stat. § 75–1.1 targets unfair and deceptive interactions between market participants. This means interactions in the business setting (1) between businesses, and (2) between businesses and consumers. *See id.*

Accordingly, the HAJMM Court reasoned that "extraordinary event[s]," such as raising capital, and internal operations of a single business, such as removing a "security from the capital structure," are not business activities within the General Assembly's intended meaning and are not 'in or affecting commerce.' HAJMM, 328 N.C. at 594, 403 S.E.2d at 493.

The Supreme Court's holding in HAJMM was subsequently reaffirmed in White v. Thompson, 364 N.C. 47, 691 S.E.2d 676 (2010). Here, the court held that because the Act's protections do not extend to a single market participant (and thus a business's internal operations), deceptive acts between one partner of a business and his other partners fall outside the Act. *See* White v. Thompson, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010).

Applying these principles to the current situation, Ross's deceptive practices were either between himself and his longtime girlfriend, McKinnell, or they were with Day Care, an LLC for which he was legally an agent. The relationship is thus either personal or internal to a single business. Therefore Ross's actions were not business activities within the General Assembly's intended meaning of the term and thus are not "in or affecting commerce."

Plaintiffs' claim under Chapter 75 is **DENIED**.

### g. Punitive Damages

Under North Carolina law, a court may award punitive damages if a defendant is liable for compensatory damages and the claimant shows fraud, malice, or willful and wanton conduct by clear and convincing evidence. *See* N.C. Gen. Stat. § 1D-15(a). Willful or wanton conduct is statutorily defined as the "conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. § lD-5(7). An award of punitive damages shall not exceed three times the amount of compensatory damages or $250,000.00, whichever is greater. *See* N.C. Gen. Stat. § 1D–25(b).

In this case, Ross's conduct has undoubtedly been committed maliciously, willfully, and wantonly. He stole Plaintiffs' money, and repeatedly deceived McKinnell to conceal his actions, both before and after his theft. He has cost the Plaintiffs' in excess of $220,000 in actual damages, plus a large, but presently unknown amount of attorneys' fees, time and effort attempting to get him to

redress his misconduct. Even now, he appears entirely unapologetic, suggesting that Day Care really

owes him at least as much as he misappropriated from it.

Consequently, Plaintiffs are entitled to an award of punitive damages against Ross of two

times the sums he misappropriated, meaning $440,000.

## II.    Pursuant to 11 U.S.C. § 523, Plaintiffs' Claims Against Defendant Are Not Dischargeable.

As described above, Plaintiffs demonstrated at trial that they are entitled to judgment on each

of their substantive causes of action.    These claims, and the right to damages that they carry, should

not be discharged by Ross's bankruptcy.    Generally, a debtor can discharge his debts in bankruptcy.

However, the Bankruptcy Act provides several exceptions to this presumption of dischargeability.

*See* 11 U.S.C. § 523(a); In re Strack, 524 F.3d 493, 497 (4th Cir. 2008). 11 U.S.C. § 523(a) provides,

in relevant part, that:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does
> not discharge an individual debtor from any debt--
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit,
> to the extent obtained by--
> (A) false pretenses, a false representation, or actual fraud, other than a statement
> respecting the debtor's or an insider's financial condition;
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or
> larceny;
>
> (6) for willful and malicious injury by the debtor to another entity or to the property
> of another entity.

11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).    Each of these sections is sufficient to make Plaintiffs'

claims non-dischargeable.    Because Plaintiffs' claims arise from Ross's fraudulent and intentional

misconduct described above, Plaintiffs' claims are not discharged.

### a. 11 U.S.C. § 523(a)(2)(A) – Plaintiffs' Claims Survive Ross's Discharge Because They Arose from his Fraudulent Conduct.

Under Section 523(a)(2)(A), a debtor's debts for money obtained by "false pretenses, a false representation, or actual fraud" are not dischargeable as a result of his bankruptcy. 11 U.S.C. § 523(a)(2)(A). The Fourth Circuit has observed that the purpose of this exception is "to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." Nunnery v. Rountree (In re Rountree), 478 F.3d 215, 219-20 (4th Cir. 2007). This exception includes all liability arising from fraud, including punitive damages. See Cohen v. DelaCruz, 523 U.S. 213, 118 S. Ct. 1212 (1998).

The meaning of the phrases "false pretenses," "false representation," and "actual fraud" are based upon the common understanding of those terms at the time § 523(a)(2)(A) was enacted. See In re Mileski, 416 B.R. 210, 224 (Bankr. W.D.N.C. 2009). In order to arrive at such understanding of the phrase "actual fraud," the United States Supreme Court has looked to the Restatement (Second) of Torts. See Field v. Mans, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Under the Restatement, "a plaintiff must prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiffs justifiable reliance on the misrepresentation." In re Mileski, 416 B.R. at 224, quoting Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 134 (4th Cir. 1999). A defendant's statement of intention is fraudulent only where he did not actually have that intention at the time the representation was made. See id.; see also Restatement (Second) of Torts § 530(1) (1976).

As described more fully above, Plaintiffs have established a right to judgment on their fraud claim. Ross intentionally made numerous false representations to Plaintiffs. Further, he intended Plaintiffs to rely on his misrepresentations. He also used Day Care's line of credit to steal Plaintiffs' money. As a result, McKinnell has a mortgage on her personal home, and Day Care did not receive

the money it was entitled to after selling a portion of the Sam Furr property. Thus, pursuant to

Section 523(a)(2)(A), Plaintiffs' claims should not be discharged.

### b. 11 U.S.C. § 523(a)(4) – Plaintiffs' Claims Survive Ross's Discharge Because They Arose from his Defalcation.

Section 523(a)(4) excepts from a debtor's discharge any debt "for fraud or defalcation while

acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4); *see also* In re

Strack, 524 F.3d 493, 497-98 (4th Cir. 2008).  Thus, Section 523(a)(4) concerns three types of debts:

(1) debts arising from fraud or defalcation while acting in a fiduciary capacity; (2) debts arising from

embezzlement; and (3) debts arising from larceny.  11 U.S.C. § 523(a)(4).

Defalcation is simply "the failure to meet an obligation" or "'a nonfraudulent default.'"

Republic of Rwanda v. Uwimana (In re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001), quoting

Black's Law Dictionary 427 (7th ed. 1999).  In order to constitute defalcation for purposes of Section

523(a)(4), an act need not "rise to the level of ... 'embezzlement' or even 'misappropriation.'"  In re

Strack, 524 F.3d 493, 498 n.7 (4th Cir. 2008), (quoting Pahlavi v. Ansari (In re Ansari), 113 F.3d 17,

20 (4th Cir. 1997)).   Indeed, negligence or even an innocent mistake which results in

misappropriation or failure to account is sufficient to except a debt from discharge under this

provision. *See id.*; *see also* In re Uwimana, 274 F.3d at 811.

Embezzlement is defined as "the fraudulent appropriation of property by a person to whom

such property has been entrusted, or into whose hands it has lawfully come."  KMK Factoring,

L.L.C., et al. v. McKnew (In re McKnew), 270 B.R. 593, 631 (Bankr. E.D. Va. 2001) (citations

omitted).  Larceny is the "fraudulent or wrongful taking and carrying away of the property to the

taker's use without the consent of the owner." In re Walker, 416 B.R. 449, 467 (Bankr. W.D.N.C.

2009) (quoting OSB Mfg., Inc. v. Hathaway (In re Hathaway), 364 B.R. 220, 239 (Bankr. E.D. Va.

2007)).  The distinction between embezzlement lies in whether debtor possessed the requisite intent originally, or not until after acquiring the property.

Here, Ross stole money from Plaintiffs.  That fact is undisputed.  Whether he never had the authority to take the money, or exceeded his authority later, Ross converted Plaintiffs' property. Thus, he should not be entitled to discharge his obligations to Plaintiffs.  Even if he did not convert Plaintiffs' property or mistakenly took the money, as he alleges, his conduct after getting caught is sufficient to satisfy Section 523(a)(4).  After Plaintiffs demanded repayment, Ross refused to give back what he admittedly took.  As described above, failure to account is also sufficient under this Section.

### c. 11 U.S.C. § 523(a)(6) – Plaintiffs' Claims Survive Ross's Discharge Because He Willfully and Maliciously Injured Plaintiffs.

Finally, Plaintiffs' claims are not dischargeable because they fall under the exception in Section 523(a)(6), providing that a debtor is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  A bankruptcy debtor's debt is non-dischargeable under § 523(a)(6) if it arose from an act taken by the debtor with the "intent to cause injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L.Ed.2d 90 (1998).  In order to make out debtor's "malicious" injury, a plaintiff is not required to show the debtor's spite or ill-will.  In re Mileski, 416 B.R. at 223 (citing In re Kim, 2008 WL 2705082, at *3 (Bankr. E.D. Va. 2008).  "Rather, it is sufficient that the act was done intentionally and deliberately in knowing disregard of the rights of another." Id.  Further, there is no need to show specific malice under Section 523(a)(6) - "something implied is no less true than something expressed." St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1010 (4th Cir. 1985).

In this case, Ross convinced McKinnell to obtain a line of credit for Day Care and then illegally drew money for himself from that borrowing account.  Ross committed these acts

intentionally, and Plaintiffs have consequently been damaged.  Because Ross's actions were both willful and malicious, his debt to Plaintiffs should not be discharged.

### III.  CONCLUSION

Day Care was created and the Sam Furr property was purchased by that LLC using McKinnell's money. These acts occurred at Ross's suggestion and in order that he could develop a day care for a third party and shelter the future sale proceeds of his Community House property from taxation.  Although not a member of Day Care, Ross was authorized to act on the LLC's behalf, and could draw on its line of credit for limited purposes. As a practical matter, he was the only one in a position to monitor Day Care's financial activities.  This arrangement was possible because of McKinnell's lack of business experience and due to her trust in Ross, based upon their personal relationship. Unfortunately, the Day Care line of credit was primarily intended, and used, by Ross not to make improvements to the Sam Furr property, but to cure his personal financial problems.

For all the reasons cited above, Plaintiffs are entitled to recover actual damages from Ross of $220,000 and punitive damages of $440,000, plus their costs of this action. These legal claim(s) are deemed non-dischargeable in bankruptcy.  A judgment shall issue accordingly.


**SO ORDERED.**


**This Order has been signed electronically.        United States Bankruptcy Court
The judge's signature and court's seal
appear at the top of the Order.**